In re H. B. HOLLINS & CO.

Ex parte HOGEBOOM.

(District Court, S. D. New York. February 9, 1914.)

PLEDGES (§ 19*)—COLLATERAL SECURITY—DRAFTS.

Where a bankrupt deposited collaterals to secure acceptances of foreign bills of exchange by R. & Sons, and the bankrupt, as an inducement to complainant's assignor to purchase certain bills drawn against such collaterals, informed it that the drawee had agreed to accept the drafts, and that the drawer had deposited collaterals against the acceptances, the collaterals operated as security for the bills before as well as after acceptance.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 58–63; Dec. Dig. § 19.*]

In Bankruptcy. In the matter of bankruptcy proceedings of H. B. Hollins & Co. On petition of John L. Hogeboom for the application of the proceeds of certain collaterals to the payment of the bankrupt's drafts. Report of referee granting such relief affirmed.

This is a motion to confirm the report of a special master. The petition was filed against a receiver in bankruptcy and is stated at length below. The receiver answered, and the issues were referred to a special master, before whom the receiver admitted all the allegations of the petition. Upon the facts as so found, the master reported in favor of the petitioner and directed that the collaterals mentioned in the petition should be used in payment of the drafts.

The following are the allegations of the petition:

I. That the International Banking Corporation, hereinafter mentioned, is, and at all the times hereinafter mentioned was, a corporation duly organized and existing under the laws of the state of Connecticut.

II. That at all the times hereinafter mentioned, Ernest Ruffer, Maurice Ruffer, and Richard de Neufville were, and still are, copartners doing business under the firm name of A. Ruffer & Sons, at No. 39 Lombard street, London, England, where at all such times they conducted and still conduct a general banking business.

III. That on or about April 21, 1911, the said A. Ruffer & Sons entered into a contract in writing with the bankrupts pursuant to which contract the said A. Ruffer & Sons agreed to accept drafts of the equivalent of about $125,000, outstanding at any one time and drawn upon them by the said bankrupts against deposit of collateral security by the said bankrupts with a New York depositary for account of A. Ruffer & Sons.

IV. That, pursuant to the said agreement, the said bankrupts, prior to drawing the drafts hereinafter described, deposited with the Equitable Trust Company, a New York corporation carrying on business at No. 37 Wall street, in the borough of Manhattan, city, county, and state of New York, certain collateral security to the account of A. Ruffer & Sons, and that the said A. Ruffer & Sons had previously thereto accepted the said Equitable Trust ·Company as a depositary under the said agreement.

V. That the said collateral security consisted of the following: 50M Detroit, Toledo & Ironton Ry. Receiver's certificates. 20M Toledo, St. Louis & Western R. R. 4. 2M Distillers Securities 5. 100 U. S. Steel preferred shares. 100 Car Foundry shares. 100 St. Paul shares. 100 British American Tobacco shares. 100 Mackay, Commercial Cable Company shares.

VI. That on or about November 7, 1913, the said bankrupts drew against the said collateral security their certain drafts or bills of exchange upon the defendants, payable 90 days after sight; the said drafts consisting of the following: £2,500, £2,500, £2,500, £2,500, £2,500, £2,500, £589 5s. 6d., amounting in all to the sum of £15,589 5s. 6d. sterling, being the equivalent of $75,000, payable at the maturity of the bills, and that the said drafts or bills of exchange are the only ones drawn by said bankrupts and now outstanding against the said securities.

VII. That on or about November 7, 1913, the said bankrupts offered for sale the said drafts or bills of exchange hereinbefore described, and represented to the said International Banking Corporation that said drafts or bills of exchange were drawn pursuant to agreement existing between the said bankrupts and the said A. Ruffer & Sons, and that the said International Banking Corporation thereafter and on the same date purchased the said drafts or bills of exchange paying for them the sum of $74,579.10, said sum being the value in exchange on that day of £15,589 5s. 6d., being the equivalent of $75,000, payable by bills of exchange in pounds sterling at 90 days after sight.

VIII. That, at the time of each drawing of drafts or bills of exchange under the said agreement, the said bankrupts wrote and mailed to the said A. Ruffer & Sons a letter in the form hereto annexed marked "Exhibit A," and made a part hereof, except that in the said Exhibit A the dates and amounts are left blank.

IX. That on or about October 10, 1913, the said bankrupts had drawn their drafts or bills of exchange upon the said A. Ruffer & Sons in the sum of £10,429 14s. 2d., sterling, the equivalent of $50,000, against securities other than those above described, which securities were also deposited with the said Equitable Trust Company by the bankrupts, and that said drafts or bills of exchange were duly accepted by the said A. Ruffer & Sons pursuant to the said agreement.

X. That prior to the purchase by the said International Banking Corporation on November 7, 1913, of the drafts or bills of exchange described in paragraph VI of this petition, it had been the custom of the said bankrupts so to deposit specific securities for the account of A. Ruffer & Sons, and then to draw drafts or bills of exchange upon said A. Ruffer & Sons against said specific securities, as in said agreement provided. That it is a well-known and established custom in dealings between New York and foreign bankers to engage in business transactions in the manner herein described; that is, where bills of exchange are drawn by a New York banker upon a foreign banker, such drawings are against specific security, of all of which facts and custom the said International Banking Corporation had knowledge and relied upon at the time it purchased the drafts or bills of exchange hereinbefore described.

XI. That on or before November 21, 1913, the said A. Ruffer & Sons refused to accept any or all of the said drafts or bills of exchange so purchased by the said International Banking Corporation, giving as a reason for such

refusal that prior to the presentation to them of the said drafts or bills of exchange for acceptance a petition had been filed by the creditors of the said bankrupts for their adjudication as bankrupts.

XII. That on November 21, 1913, and subsequent to the matters hereinbefore set forth, the said International Banking Corporation duly assigned to your petitioner by instrument in writing all cause or causes of action to it belonging because of the matters above stated, and also all its right, title, and interest in and to the securities hereinbefore described, and that your petitioner is the owner and holder of the said drafts or bills of exchange purchased as aforesaid by the said International Banking Corporation.

XIII. That by reason of the matters aforesaid your petitioner became the owner of an interest in the said securities against which the said, drafts or bills of exchange so purchased by its assignor were drawn, equal to $75,000, payable in pounds sterling at the rate of exchange prevailing at the time of such payment, with interest thereon, if payment delayed after the maturity of the said drafts or bills of exchange, and the expense to which it had been put by reason of the said refusal of A. Ruffer & Sons, to accept the said drafts, but that the receiver is unwilling to recognize the said interest of your petitioner and desires an order of court, and the said Equitable Trust Company refuses to surrender the said securities to your petitioner, except with the consent of the said receiver.

Charles C. Deming and W. W. Lancaster, both of New York City, for petitioner.

George M. Mackellar, of New York City, for receiver.

HAND, District Judge (after stating the facts as above). The seventh article of the petition alleges that the drawer represented to the purchaser that the "drafts were drawn pursuant to agreement existing between" the drawer and the drawee. The petition in the tenth article alleges that it was a well-known and established custom in such cases for the New York banker to deposit against these drafts specific security, and that of this custom the purchaser had knowledge and relied upon it. The representation must therefore be interpreted as equivalent to the drawer's statement as an inducement to the purchaser that the drawee had agreed to accept the drafts and that the drawer had deposited collateral against the acceptances. I do not think that the drawer should be thought to have said this only to persuade the purchaser that the drawee would accept because he had agreed to accept, but also to persuade him because securities had been deposited against the acceptances. The turning point of the case then becomes this: Should this representation as to the collateral be limited to the period after acceptance, or should it be interpreted as extended on the purchaser's behalf so as to cover the whole period during which the draft was outstanding?

The Court of Appeals of the State of New York, in Muller v. Kling, 209 N. Y. 240, 103 N. E. 138, in the case of an express representation that the acceptance would be secured, has held that the security inured as well to the purchaser before acceptance as after. In that case Judge Gray suggests that the interview between the drawer and the purchaser must have meant something relative to the purchaser's proposed action. It must have been intended to induce him to buy the draft by assuring him that at some time he would have the benefit of the collateral. That the period which he should have that benefit should include the time before acceptance I think is clear, for the following reasons: Be-

fore acceptance the holder has the security only of the drawer; after acceptance he has the security of both drawer and drawee. To assure the holder that he may rely upon the drawer's collaterals can hardly in reason be interpreted as covering only that period when he has the credit of both drawer and drawee. That would be to secure him while he has the security of two names and leave him unsecured while he has but one of the two, which is a most unlikely purpose to attribute to the parties. I can well understand how the contrary might be true, if acceptance relieved the drawer, and so left the holder with the obligation only of a foreign acceptor about whom he might be supposed to know little; but I can see no reason why, when the drawer is representing that there are securities against his own obligations, he should be thought to intend those obligations only during a time when they were already secured by the added obligation of the drawee. Any purpose to induce the purchaser to buy on the faith of the collateral ought to include, I should think, the whole time when he held them.

As I view the case, therefore, it does not present the question of a drawer securing the drawee and selling the draft without any representation. It is therefore not necessary to consider the propriety of the ruling in Watts v. Shipman, 21 Hun, 598, which seems to go to the extent of allowing the holder recourse against the collateral in that case. Marine Fire Insurance Bank v. Jauncey, 3 Sandf. 257, is not to the contrary. In the first place, the drawee had accepted, and the purchaser was of course entitled to the security if there was security. The only question was whether the cotton was general assets or specifically pledged, and the court held it was general assets which the drawee might apply generally on his account, as he did. I can hardly think that any general questions of equity arise, or that Hurley v. Atchison, Topeka & Santa Fé Ry., 213 U. S. 126, 29 Sup. Ct. 466, 53 L. Ed. 729, has any application. The question is, of the interpretation of the parties' intention, and is equitable only in the sense that all such interpretations involve questions of equity. The case depends, I think, upon the fact that the drawer represented to the purchaser, among other things, that the draft was secured, and that this representation should be construed as the Court of Appeals construed it in Muller v. Kling, supra.

The report is affirmed, with costs.